UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA,

                -against-

ANCHOR FOODS, INC., ADVANCED
FROZEN FOODS, INC., ROY TUCCILLO, SR.
and ROY TUCCILLO, JR.,

                        Defendants.
----------------------------------------------------------------x

**REPORT AND**
**RECOMMENDATION**

18-CR-0522 (SJF)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court, on referral from the Honorable Sandra J.
Feuerstein for Report and Recommendation, is the issue of the amount of the loss or
gain resulting from Anchor Foods, Inc.'s, Advanced Frozen Foods, Inc.'s, Roy Tuccillo,
Sr.'s and Roy Tuccillo, Jr.'s ("Defendants") criminal conduct for which each of them
pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 371 & 1343.
The amount of the loss or gain will directly impact each Defendant's United States
Sentencing Guidelines calculation (the "Sentencing Guidelines").  *See* U.S.S.G §
2B1.1(a),(b).  For the reasons set forth below, the Court concludes that the amount of
the loss cannot be "reasonably calculated" as required by the Sentencing Guidelines.
As a result, the Court determines the amount of Defendants' gain, such that they all
fall under U.S.S.G. § 2B1.1(b)(1)(G), providing for an increase of 12 levels.

## I.    Background

This prosecution arises from the individual Defendants, Roy Tuccillo, Sr. and
his son Roy Tuccillo, Jr. acting in concert through two companies that Roy Tuccillo,

Sr. owns and both individual Defendants operate:  Defendants Anchor Foods, Inc. and Advanced Frozen Foods, Inc.  The individual Defendants used these entities in part to sell frozen squid unlawfully mislabeled as octopus.  Roy Tuccillo, Sr. was the president and Chief Operating Officer of the two corporate Defendants and maintained complete control over their operations.  *See* Transcript of Criminal Cause for Valuation Hearing Before the Honorable Steven I. Locke, United States Magistrate Judge, February 27, 2020 ("Tr."), Docket Entry ("DE") [41], 23:18-24:3. Roy Tuccillo, Jr. was responsible for sales.  *Id*. at 24:4-10.  The corporate Defendants functioned "virtually interchangeabl[y]," marketing and selling the frozen seafood at issue.  *Id*. at 24:13-19.

By indictment dated September 26, 2018, Defendants were charged with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 371 & 1343 and four counts of Lacey Act violations for false labeling of products in violation of 16 U.S.C. §§ 3372(d)(2) and 3373(d)(3)(A)(ii) and 18 U.S.C. § 2.  *See* DE [1].  On November 25, 2019, each of the Defendants pled guilty to Count 1 for conspiracy to commit wire fraud before this Court.  *See* DE [30] (recommendation to Judge Feuerstein to accept guilty pleas); Transcript of Guilty Pleas Before the Honorable Steven I. Locke, United States Magistrate Judge, November 25, 2019 ("Guilty Pleas Tr."), DE [31]; *see also* DEs [33]-[36] (orders accepting recommendation of guilty pleas).  At the guilty plea hearing, each Defendant allocuted that from February 2011 to January 2014, he or it was legally importing squid from Peru to Westbury, New York, where Defendants are based, and then intentionally reselling the squid

mislabeled as "octopus" or "octopus-style," which is not "up to the government's standards" as to what was actually contained in the packaging. *See* Guilty Pleas Tr., 25:14-27:7, 47:14-49:8, 66:14-68:7, 85:23-87:11. This activity was carried out through wire transfers, faxes and emails as part of interstate commerce. *Id.* During the pleas, the Government and Defendants agreed that a "valuation hearing" to determine the amount of the loss or gain resulting from Defendants' criminal conduct would be needed to determine the appropriate Sentencing Guideline range, *id.* at 17:16-20, 88:13-16, and on February 27, 2020, a hearing was held for this purpose (the "Hearing"). *See* DE [40]; *see also United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978) (recognizing hearings conducted in aid of sentencing).

The evidence at the Hearing, which was extremely limited and is not in dispute unless otherwise indicated, established the following. The U.S. seafood industry does between $3.5 billion and $4.5 billion in business each year. *See* Tr., 10:11-14. In 2013, the Food and Drug Administration (the "FDA") forwarded a complaint to law enforcement alleging that from February 17, 2009 to October 29, 2012, Defendants were importing giant squid, *Dosidicus gigas*,[1] from Peru, mislabeling it as octopus, and selling it frozen to supermarkets and resellers. *Id.* at 10:15-11:6, 16:4-10 (supermarkets "were all under the understanding that they were purchasing octopus[]"), 22:14-15 (the seafood at issue was all frozen), 41:3-14 (the giant squid was from Peru); *see also* Gov. Memo, 2, Ex. 1. Octopuses are typically imported from

---

[1] The scientific identification for these squid is mistyped in the hearing transcript as *Decidic architeuthis* and corrected in a subsequent submission to the Court. *See* Government's Proposed Findings of Fact and Conclusions of Law ("Gov. Memo"), DE [44], 2, Exhibit ("Ex.") 1.

Mediterranean countries.  Tr., 12:17-22.  Squid and octopus are of different taxonomic orders, as far apart in relationship as humans and whales.  *Id*. at 11:14-21; *see also* Exs. 1, 2 (pictures of each animal).[2]  Under the FDA regulations, octopus can only be labeled as octopus, while squid may be labeled as squid or calamari.  Tr., 11:7-13. While the giant squid at issue were imported from Peru, the sales of the giant squid were consummated locally by e-mail and fax, and payments were processed this way as well.  *Id*. at 25:15-29:9; *see also, e.g.*, Ex. 9 (email correspondence).  Defendants' use of e-mail and fax to sell and receive payments for the squid is the conduct underlying the wire fraud charge to which Defendants pled guilty.  Tr., 25:20-26:2.

It is unclear what the underlying market for giant squid would be during the relevant time period had it been properly labeled.  Initially, the Government investigator testified that there was no market at all.  *Id*. at 16:1-3 ("There is a very small market now, but then there was not").  Then during subsequent questioning from the Court, he stated, "there was very little market, if any."  *Id*. at 29:13-21.  Yet during the investigation, the investigator found squid was for sale in the frozen seafood section at the grocery stores that he went to.  *Id*. at 21:19-22:3.  Upon further inquiry, he explained that the squid he saw in supermarkets was a different species, *Loligo chinensis* (from Asia) or *Loligo pealei*, (which is domestic), and these species are used to make calamari.  *Id*. at 29:22-31:12; *see also* Gov. Memo, Ex. 1.  They are different in size and quality than the Peruvian giant squid, *Dosidicus gigas,* that Defendants were mislabeling as octopus.  Tr., 29:22-31:12.  This explanation,

---

[2] Taxonomic rank is classified by kingdom, phylum, class, order, family, genus and species.  *Russell Stadelman & Co. v. United States*, 242 F.3d 1044, 1046 n.4 (Fed. Cir. 2011).

however, was somewhat muddled by other testimony, in which the same Government investigator testified that the FDA permits giant squid to be labeled and sold as calamari. *Id.* at 11:7-13. Further, when the investigator was asked which species a restaurant would want to use or a grocer would want to sell, he responded: "[I]t's hard to say which but they would lean—I would assume that they would lean toward the known product of *Loligo chinensis* [or] the domestic *Loligo* product." *Id.* at 49:17-24. He did not explain the basis of his presumption and no other explanatory evidence was offered in this regard. Then, on cross-examination, the investigator modified his testimony and stated that there was a market for the squid during the relevant time period but it was "[v]ery, very, very small . . . there was always a market value, but it was very low," and difficult to move at the volume of the mislabeled products. *Id.* at 42:11-25. Finally, he described the market for squid as a "developing market" that was "very small[]" at the time. *Id.* at 49:25-50:5.

In receiving this testimony, the Court notes that the investigator seemed unsure of his answers. Moreover, the only corroboration of the investigator's testimony was his reference to an unidentified employee of Defendants to whom he spoke, unspecified "industry complaints[,]" and conversations with other unidentified individuals in the seafood industry—all of whom said that it was "more difficult" to sell the product labeled as giant squid as opposed to octopus, but not that it could not be done. *Id.* at 42:14-43:15. This conclusion finds further support in various exhibits entered into evidence at the Hearing, which show that Defendants' imports of Peruvian giant squid included squid rings, slices, tentacles and bits and pieces. *See*

Gov. Memo, 2; Exs. 12, 13; *see also* Exs. C, D (invoices indicating sales of squid rings, tubes/tentacles).  Yet, the fraudulent sales only included the slices and tentacles, *see id.*, implying that the rings and bits and pieces were sold legitimately on an open market, and there was no evidence offered to the contrary.

In terms of "value," the wholesale giant squid would be about one dollar per pound, maybe less, the *Loligo* species would be two to three dollars per pound and the octopus would be three to four dollars per pound.  Tr., 31:17-32:8.  When the Government investigator was asked whether he knew that the grocery stores sold the squid they mistakenly believed to be octopus at a price higher than the wholesale rate, he responded only that "[p]resumably there would be a markup."  *Id.* at 33:3-6; *see also id.* at 79:10-15 (Government's expert:  "[G]enerally speaking, the grocery store . . . [is] going to sell it for something in excess of that.").

In any event, these prices were subject to fluctuation, and they could even "flip-flop," *id.* at 32:6-13, 40:15-18, which the Court understood to mean that the price of giant squid could sometimes exceed the price of the *Loligo* varieties, which in turn could, at times, exceed the price of octopus, and perhaps even that, on occasion, the price of giant squid would exceed the price of octopus.  There is no way to know because no testimony or evidence was introduced in this regard other than to say that the market fluctuated "occasionally[,]" without elaboration.  *Id.* at 32:6-13.  The Government's investigation, which lasted four years, never led to a determination as to the price at which the grocery stores sold this mislabeled product.  *Id.* at 32:21-33:2.  When asked why the Government was not able to make this determination, the

6

investigator responded only: "[T]here's product loss, [grocery stores] fluctuate in how much they order. We didn't go to that level." *Id*. at 32:25-33:2.

In terms of the criminal conduct at issue, Defendants sold the mislabeled squid, both as: (1) frozen octopus; and (2) part of something called "seafood medley," which, according to Defendants' inventory, contained "salad shrimp, imitation crab, squid rings or calamari, and octopus." *Id*. at 22:9-15, 33:7-34:1. An examination of the product and Defendants' inventory system established, however, that the seafood medley did not contain octopus, but instead contained giant squid. *Id*. at 33:19-34:16. Accordingly, both the frozen octopus and the seafood medley were mislabeled. *Id*. The Government did note that at the same time, Defendants were selling some form of properly labeled frozen squid as part of these medleys, but it was a "small part" of the larger mislabeled sales. *Id*. at 34:17-35:1. Nevertheless, this fact appears to further establish that there was at least some market for the giant squid. In any event, the Court notes that anything Defendants sold as octopus was mislabeled, as they never imported any octopus for sale. *Id*. at 35:15-21 (Defendants imported "zero octopus[,]" and "[z]ero" percent of what consumers purchased from Defendants contained octopus as indicated on the products' labels).

Moreover, the Court notes that there was no evidence submitted concerning any difference in nutritional value or taste between octopus and squid. *Id*. at 37:6-38:2. There were no consumer complaints about Defendants' products and no evidence of any health issues caused by their products. *Id*. at 38:14-20. Further,

there would be nothing inherently unlawful about selling the squid or seafood medley with all of its constituent parts had they been properly labeled. *Id*. at 46:22-25.

In terms of evidence relevant to the calculation of the loss or gain, Defendants made $1,128,388.50 in total fraudulent sales of frozen squid, comprised of $590,177.50 in squid slices and $538,211.00 in tentacles. Exs. A, 11 (Corrected Calculation). Defendants imported 302,430 pounds of slices at a cost of $350,818.80 and 273,015 pounds of tentacles at a cost of $221,142.15. Ex. A. Accordingly, the total costs of the fraudulently sold squid came to $571.960.95. *Id*. This product was sold to 17 grocery stores. Ex. 13.

Applying these total sales figure for the mislabeled giant squid, the Government calculates a total profit to Defendants of $555,797.15. Tr., 63:23-67:19; Ex 11.[3] In reaching this figure, the Government took the amount made from the sales of the mislabeled squid and deducted only one variable expense, namely the cost of the squid. Tr., 61:3-62:3. Other variable expenses, such as transportation costs, repackaging costs, associated labor, lost product and insurance if borne by Defendants, were not included in the calculation, though there was no substantive explanation for this omission. *Id*. at 62:4-19. Fixed costs, such as rent and electricity, were not included because they would be incurred regardless of whether the mislabeled squid was sold. *Id*. at 61:3-62:3, 75:22-76:6, 81:1-83:21. Accordingly, in arriving at its profit calculation, the number is necessarily overstated because the Government's expert accountant did not have access to the variable expenses which

---

[3] The calculation was comprised of two sub-calculations—one for sliced squid and one for tentacles—because they had different sale prices. The two subtotals were then combined. *Id*. at 64:1-7; Ex. 11.

would be properly deducted. *Id.* at 89:13-90:4 ("there should have been some expenses deducted . . ."). Had these figures been included, the profit calculation dips below $550,000.00, which is relevant for Sentencing Guidelines purposes. *Id.* at 127:2-14; *see* U.S.S.G. § 2B1.1(a),(b).

## II.    The Parties' Positions

The Government's ultimate calculation for the amount of the loss is the total sales figure, $1,128,388.50. Gov. Memo, 4. The total sales amount equals the total loss because the squid that was sold had no value. According to the Government's expert, who has no experience in the seafood industry, if there was any market value for the squid, Defendants would have sold it properly labeled. Tr., 91:3-92:16, 94:1-6. Moreover, if the end customers at issue had wanted frozen squid, or seafood medley containing no octopus, then that is what they would have purchased. Gov. Memo, 4 (without citation to the record) ("If the buyers wanted to eat squid, they would have bought squid . . .").

Defendants argue that the loss cannot be properly calculated because there is insufficient evidence. There is no computation as to what the end consumers paid, and the Government fails to account for the market value of squid ultimately sold. *See* Defendants' Right to Deduct Expenses to Offset Gain or Loss ("Def. Expense Deductions"), DE [37], 1-2; Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. Opp."), DE [45], 3-4. Accordingly, Defendants' gain is properly applied. This calculation would require a computation of the difference between the amount paid for mislabeled squid and the amount paid for properly identified squid, a value

greater than zero. Tr., 100:12-102:13. In order to value the squid, Defendants' expert used corporate records which demonstrated a price for properly labeled product. *Id.* at 104:3-105:2; Exs. C, D (invoices with prices for squid).[4] Then, using these prices, Defendants' expert made two calculations—one, taking an average price for squid using the prices for squid tentacles and seafood medley, which, as set forth above, contained salad shrimp, imitation crab, squid and purported octopus, and a second, using the lowest price indicated for squid and seafood medley. Tr., 105:11-106:15. These two calculations showed a loss to Defendants (not their victims) of $48,746.25 when the average price was used, and a gain of $104,353.50 to Defendants when the lowest price was used. *Id.* at 105:11-107:14. Defendants' expert then cross-checked his calculations against Internal Revenue Services ("IRS") tables demonstrating gross and net profit margins for businesses selling groceries and related products wholesale and compared them to Defendants' 2009 and 2010 tax returns, which were the only ones provided by the Government. *Id.* at 117:4-118:12; Def. Opp., 11. Based on this cross-check, he concluded that his profit determination, nine percent for 2009 and 13 percent for 2010, were more in line with IRS calculations of net profit margins of three to five percent and gross profit margins between 12 and 20 percent, than the Government's calculations, which provided for a 50-percent gross profit margin. Tr., 117:4-18:24; Ex. B.[5]

---

[4] The Court notes that Defendants' expert did not expressly reference specific invoices in his testimony, apparently an oversight. The invoices were then submitted as exhibits at the end of the Hearing without objection. Tr.,123:20-124:7.

[5] The Court finds these calculations to be of limited value given that the tax returns were for the years 2009 and 2010 only, a period not addressed in the Indictment, and different years than the IRS tables cover, namely 2011-2013. Moreover, neither set of documents addressed solely seafood. Defendants' business and tax returns included sales for meat and poultry, as did, presumably, the IRS tables.

The question before the Court is which calculation is appropriate to determine the amount of the loss or gain under the Sentencing Guidelines, and the amount of this calculation.

### III.   Analysis

Determination of the amount of the loss or gain in connection with fraud offenses, such as the one at issue here, is addressed by U.S. Sentencing Guideline § 2B1.1(b)(1), which contains a table of increasing sentencing levels as the amount of the loss or gain increases. *See* U.S.S.G. § 2B1.1(b)(1). The "loss" is the greater of the actual or intended loss, actual loss being the reasonably foreseeable pecuniary harm resulting from the offense, and the intended loss being the pecuniary harm the defendants intended to inflict. *Id*. cmt. n. 3(A)(i)-(ii). The Court need only make a "reasonable estimate" which "shall" be based on available information, such as "[t]he fair market value of the property unlawfully taken," and general factors including the scope and duration of the offense. *Id*. cmt. n. 3(C). Accordingly, "a fraudulently induced purchase of certain assets does not cause loss equaling the entire purchase price if the assets actually have some value greater than zero." *Thaler v. United States*, 706 F. Supp. 2d 361, 370 (S.D.N.Y. 2009) (citing *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008));[6] *see also* U.S.S.G § 2B1.1 cmt. n. 3(E)(i) (the loss should be

---

[6] In stating this proposition, the Court is mindful that the holding in *Leonard* was based on U.S.S.G. § 2F1.1 from 2000, and its Application Note 8(a), which has since been deleted. *See United States v. Gulshak*, 03-cr-833, 2011 WL 3159170 at *3 n.6 (E.D.N.Y. Jul. 26, 2011). *Leonard*, however, has nevertheless been cited with approval by the Second Circuit in more recent decisions applying U.S.S.G. § 2B1.1 and its Application Notes. *See United States v. Stitsky*, 536 Fed. Appx. 98, 111-12 (2d Cir. 2013); *accord United States v. Geringer*, 672 Fed. Appx. 651 (9th Cir. 2016) (vacating and remanding where district court failed to account for the actual value of the asset fraudulently transferred when calculating the amount of the loss).

reduced or offset by the "money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected[]").

Ordinarily the Court should base its calculation on the amount of loss, substituting the amount of a defendant's gain "'only if there is a loss but it reasonably cannot be determined.'" *United States  v. Byors*, 586 F.3d 222, 225-26 (2d Cir. 2009) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(B)).  The Sentencing Guidelines do not, however, require an offset for "any legitimate [business] expenditures . . . but rather by 'value' that has been conferred on victims in the form of money or property returned or services rendered." *Id.* at 226 (citation omitted).  Where the amount of the loss is in dispute, the burden of proof must be satisfied by a preponderance of the evidence. *See United States v. Brennan*, 395 F.3d 59, 74 (2d Cir. 2005).  Initially, the Government bears the burden of establishing the loss amount. *United States v. Bin Wen*, 17-cr-6173, 2019 WL 364571 at *3 (W.D.N.Y. Jan. 30, 2019).  Once that burden is satisfied, the defendants have the burden to show that they provided something of value. *Id.* ("[O]nce the Government has borne that burden, Defendants cannot simply make unsupported assertions that they provided a valuable service.  [They] must produce evidence to support that claim.").

In applying these standards, the Court concludes that while there was a loss, the amount of the loss cannot be reasonably calculated.  Initially, the Government characterizes the grocery stores that purchased the frozen squid from Defendants as "victims[.]" *See* Letter re: Fraud Valuation ("Gov. Fraud Valuation"), DE [39], 2.  Yet

the Government's own testimony shows that the grocery stores suffered no loss, given the Government's presumption that they took the mislabeled squid and resold it at a profit.  Tr., 33:3-6, 79:10-15.  The Government further characterizes the end purchasers as "ultimate victims."  *See* Gov. Fraud Valuation, 2.  There is, however, no evidence as to what the purchasers paid for the product.  Further, there is no evidence of difference in taste or nutritional value, customer complaints, health problems or any other issues arising from the purchase of the mislabeled squid.  In fact, there is no evidence that a single consumer indicated a preference for octopus over squid, other than the actual purchases.  Accordingly, while the Government has established a loss, that loss cannot be reasonably calculated.  *See Byors*, 586 F.3d at 226.  Further, as addressed below, the Court finds the squid had a value greater than zero that cannot reasonably be calculated from the evidence submitted.[7]

In reaching this conclusion, the Court rejects the Government's estimated actual loss of $1,128,388.50, the total monetary value of squid slices and tentacles sold to grocery stores, which the Government understandably claims, without evidence, was resold to consumers.  *See* Gov. Memo, 4-5.  The Government's argument that the squid had no market value on its own is both belied by the evidence and not logically compelled.  *See id*.  Initially, the Court notes that the Government investigator's testimony assigning no value to the mislabeled squid was not sufficiently credible to satisfy its burden of proof.  He initially testified that there was

---

[7] Interestingly, in its post-Hearing submission, the Government argues metaphorically that the end customers "are the shoppers who the defendants left holding an empty bag."  Gov. Memo, 4.  The argument fails for the same reason as the metaphor.  The shoppers' bags were not empty.  They had bags of squid, which were apparently consumed without incident or complaint.

no market for the mislabeled squid, then that the market was small and developing. Tr., 16:1-3, 29:13-21, 42:11-25, 49:25-50:5.  He further stated that while there was a market for squid served as calamari, this was a different species of squid, but when pressed, could not say with any certainty whether restaurants would shop for the Peruvian giant squid, like the kind Defendants sold, or the *Loligo* varieties, which he claimed are distinguishable.  *Id.* at 29:22-31:12, 49:17-24.  Moreover, he testified that the prices of seafood fluctuate and sometimes "flip-flop" in terms of which is more expensive.  *Id.* at 32:6-13, 40:15-18.  The only support for his conclusion came from conversations with unidentified individuals at unidentified times and locations.  *Id.* at 42:14-43:15.  Finally, at various points during his testimony, the Government investigator seemed unsure of his answers.

Moreover, the argument that Defendants would have sold the frozen squid properly labeled as such if a market for the squid existed is made with no supporting evidence and is contradicted by another equally likely reason for the mislabeling, namely that squid sells at a lower price point than octopus.  *Id.* at 31:17-32:8 (noting the general differences in wholesale prices).  Accordingly, Defendants simply mislabeled the squid as octopus to increase their overall profit margins, making more money for less work, as opposed to there being no market for squid.  For these reasons, the Court is unwilling to conclude that the mislabeled squid had zero value, or that the amount of the loss is reasonably calculated at $1,128,388.50.

Defendants, on the other hand, attempt to create an unreasonably high value of the squid by using the price of tentacles and the seafood medley, which contains

other products such as shrimp, imitation crab and properly identified calamari, as a proxy for the squid mislabeled as octopus. Ex A; Tr.,105:11-107:14. These proxies are inappropriate where, as here, there was no testimony at the Hearing that such products are fungible, or at least sufficiently close that the price of one is comparable to the value of the other. At bottom, Defendants are implicitly asking the Court to conclude that all frozen seafood is the same to consumers without offering any evidence that this is the case. Defendants' expert ran two calculations. For the first calculation, Defendants' expert identified an average value for the properly labeled squid by using the aforementioned proxies and determined that Defendants' fraudulent conduct actually resulted in a loss to Defendants, rather than to their victims, of $48,746.25. Ex. A; Tr., 104:3-107:14. There was no evidence submitted as to why Defendants would maintain a fraudulent scheme for years to their own detriment, and the Court cannot imagine one. The second calculation shows a gain to Defendants of $104,353.50. To reach this amount, Defendants' expert used the lowest price for properly labeled squid, claiming that he did so "to give the [G]overnment the benefit of the doubt[,]" Tr., 104:18-105:9, without any explanation as to why Defendants would run a pro-Government calculation, other than to tacitly admit that their lower calculation makes no sense.

The problem, of course, then becomes how to assign a value to the squid. There was some evidence submitted at the Hearing that four categories of Peruvian giant squid were purchased and sold by Defendants, namely slices, rings, bits and pieces and tentacles. Exs. 12, 13. And there is enough data to calculate a price per pound

for each category, though the Government only did this for the slices and tentacles, which serve as the basis for its loss computation. The Court could then use the price per pound for the bits and pieces and rings as proxy values for the slices and tentacles that appear to have been lawfully sold. The problem again, however, is that there is no evidence that the different squid parts are in any way fungible, or that they were even sold lawfully, and so the Court is hesitant make this leap *sua sponte*.

Instead, the Court concludes that it is on firmer ground estimating the amount of Defendants' gain. With respect to the gain, the Government argues that the value should again be $1.1 million. Gov. Memo, 7-8. Again, the Court disagrees. The Government's argument here is again that the giant squid at issue had no market. As set forth above, the Government's expert, with no experience in the seafood industry, simply deduced that if the Peruvian giant squid, which sells at a cheaper price than the octopus, could have been sold lawfully, then that is what Defendants would have done. Tr., 91:3-92:16, 94:1-6. This is too great a leap in logic. Equally likely is that Defendants realized that they could make more money for less work by claiming that the squid was octopus because it sells at a higher price, reasoning that most, if not all, frozen seafood consumers could not tell the difference. They then mislabeled the squid and reaped a larger profit. The Government offered no evidence on this topic, however.

The question then becomes how most reasonably to calculate the gain. At the Hearing, the parties agreed on several points. They agreed that there were total sales of the mislabeled squid in the amount of $1,128,388.50. Ex. A, Corrected Calculation;

Tr., 85:14-86:5 (Government expert agreeing that the corrected calculation is accurate).  They also agreed that Defendants' total purchase price for the mislabeled squid was $571,960.95, yielding a gain to Defendants of $556,427.55.  *Id*.  Finally, the parties agree that this figure is overstated because the gain fails to take into account certain variable expenses that Defendants incurred in obtaining, maintaining and selling the mislabeled squid, such as transportation costs, repackaging costs, associated labor and lost product insurance, incurred by Defendants.  *Id*. at 62:4-19, 75:22-76:6, 81:1-83:21, 89:13-90:4.  If these expenses are properly included in the calculation, the Government concedes that the gain is less than $550,000.00, Gov. Memo, 8; Tr., 127:2-9, which requires an increase of 12 levels for Sentencing Guidelines purposes, and this is the recommendation to Judge Feuerstein.  *See* U.S.S.G. § 2B1.1(b)(1)(G) (where the amount is greater than $250,000.00 and less than $550,000.00, add 12 levels).

In reaching this conclusion the Court rejects the Government's interpretation of *United States v. Byors*, *supra*.  According to the Government, *Byors* prohibits deducting all costs that Defendants incurred with respect to the squid sold, requiring a $1.1 million valuation of the gain.  Gov. Memo, 8-9.  *Byors* does not support the Government's position.  Rather, *Byors* speaks to calculations of loss, not gain, and while it does not allow for all legitimate expenses to be deducted, it does recognize that any value transferred to the victims may be deducted, and this is what the Court

does here.  *See Byors*, 586 F.3d at 225-26.  Accordingly, *Byors* does not require a different result.[8]

## IV.   Conclusion

For the reasons set forth above, the Court respectfully recommends applying the amount of the gain in order to determine the amount of the loss, and that while a specific number cannot be established, the Court recommends an addition of 12 levels for Sentencing Guidelines purposes*, see* U.S.S.G. § 2B1.1(b)(1)(G), in computing Defendants' sentencing guidelines range.

## V.   Objections

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.   Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen days.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a) and 6(d).  Failure to file objections within this period waives the right to appeal the District Court's Order. *See Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

---

[8] To the extent Defendants have argued for a lower value for the gain, the Court rejects this argument. As set forth above, Defendants' expert's calculations—one establishing that Defendants actually lost money for years by engaging in their fraudulent scheme and the other that was purportedly run for the "benefit" of the Government—are both based on inappropriate proxy prices for the squid and are therefore unconvincing.   Further, Defendants' attempt to use IRS tables to corroborate their calculations, where the actual amount of the gain is available as set forth above, is without merit.

Dated:      Central Islip, New York
            May 10, 2020                    /s/ Steven I. Locke
                                            STEVEN I. LOCKE
                                            United States Magistrate Judge